UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL NO. 20-1033 (DSD/HB)

Martin J. Walsh,
Secretary of Labor, United
States Department of Labor,

                    Plaintiff,

v.                                              **ORDER**

Alpha & Omega USA, Inc.
doing business as Travelon
Transportation and
Viktor Cernatinskij, an
individual,

                    Defendants.


        Lindsey Rothfeder, Esq., United States Department of Labor,
        Office of the Solicitor, 230 South Dearborn Street, Suite
        844, Chicago, IL 60604, counsel for plaintiff.

        Michael J. Minenko, Esq. and Minenko Law, LLC, 2051 Killebrew
        Drive, Suite 611, Bloomington, MN 55425, counsel for
        defendants.


        This matter is before the court upon the motions for summary

judgment by plaintiff Martin J. Walsh,[1] the Secretary of Labor,

and defendants Alpha & Omega USA, Inc. d/b/a Travelon

Transportation and Viktor Cernatinskij.  Based on a review of the

file, record, and proceedings herein, and for the following

reasons, the Secretary's motion is granted and defendants' motion

is denied.

_____

        [1]  The complaint was filed by former Secretary of Labor,
Eugene Scalia.

## BACKGROUND[2]

This Fair Labor Standards Act (FLSA) dispute arises out of Travelon's classification of its drivers as independent contractors. Travelon is a Minnesota corporation that provides special transportation services (STS), or non-emergency medical transportation, in the Minneapolis-St. Paul area. Am. Answer ¶ 3. Minnesota law defines STS as "motor vehicle transportation ... serv[ing] individuals who are elderly or disabled and who are unable to use regular means of transportation but do not require ambulance service." Minn. Stat. § 174.29, subdiv. 1. There is no dispute that Travelon has an annual gross volume of sale or business of at least $500,000 or that its drivers are engaged in commerce.

The Secretary alleges that defendants misclassified twenty-one STS drivers as independent contractors. The drivers transported Travelon customers to and from medical appointments. Viktor Cernatinskij Dep. at 53:11-54:18.

Viktor Cernatinskij is the founder, sole owner, and chief executive officer of Travelon, and claims to be its only employee.

---

[2] Defendants make many unsupported, misleading, and refuted factual assertions in their briefing. Because they are unreliable, the court will not include them in the background section. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts ....").

Defs.' Suppl. Interrog. No. 2.  Viktor Cernatinskij is "responsible for all aspects of the management and operations of Travelon." Id.; Viktor Cernatinskij Dep. at 90:8-91:24.   His specific responsibilities include hiring drivers, setting pay, directing work, and ensuring drivers comply with the law.  Defs.' Suppl. Interrog. No. 2; Viktor Cernatinskij Dep. at 90:8-91:24.  He also occasionally works as dispatcher when needed.  Viktor Cernatinskij Dep. at 103:1-18.

Maria Cernatinschi is Viktor Cernatinskij's sister and Travelon's registered agent, and she has worked as Travelon's dispatcher for twenty years with no other employment.  Maria Cernatinschi Dep. at 23:22-25; Defs.' Interrog. No. 5; Ex. I, ECF No. 48-9.[3]  Mia Oi also works as a Travelon dispatcher.  Defs.' Interrog. No. 5.

Travelon registered with Minnesota Health Care Programs (MHCP) and the Minnesota Department of Transportation (MNDOT) as an STS provider.  Defs.' First Requests for Admis. No. 45; Viktor Cernatinskij Dep. at 62:4-20; Ex. F, ECF No. 48-6.  MCHP and MNDOT require providers to register with the state, obtain a MNDOT number, and perform driver background checks. See https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAM

---

[3]  The Secretary filed a number of exhibits, docketed at ECF Nos. 48 and 49, that are not attached to a declaration.  The court will cite the ECF number associated with the exhibits when referencing the exhibits.

IC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=EN

ROLL-HOME; https://www.dot.state.mn.us/cvo/sts/pdf/sts-business-

info-docs.pdf.

I.   **Drivers' Experiences with Travelon**

To qualify as a Travelon driver, applicants must be eighteen

years old, have a driver's license, and have one year of driving

experience; prospective drivers do not need a high school degree.

Alpha & Omega Dep. at 14:12-15:10, 39:14-18, 40:13-15.  Applicants

are not required to have experience with non-emergency medical

transportation, individuals with disabilities, or the elderly, and

many did not.  Id. at 40:1-12; Viktor Cernatinskij Dep. at 269:12-

16; Krueger Decl. ¶ 3; Bents Decl. ¶ 4; Derevyanko Dep. at 28:14-

17.  Each driver is required to undergo a background check, but no

one was ever disqualified on that basis.  Alpha & Omega Dep. at

17:5-9, 22:1-25, 27:11-24, 29:2-30:10.

Viktor Cernatinskij sent "lots of drivers" to long-time

Travelon driver, Jeff Anderson, for on-the-job training.  Viktor

Cernatinskij Dep. at 233:2-24; Krueger Decl. ¶¶ 33, 36.  Viktor

Cernatinskij told Anderson to emphasize certain aspects of the job

during training, especially safety precautions.  Viktor

Cernatinskij Dep. at 236:11-19.  In some cases trainee drivers

would either pay Travelon or Anderson, and in other cases Travelon

would pay Anderson directly.  Id. at 236:23-237:9.  Training

included instruction on how to operate vans with wheelchair lifts

and how to complete trip logs.  Bents Decl. ¶ 6; Krueger Decl. ¶ 36.  Trainees usually spent between two and six hours in training. Alpha & Omega Dep. at 34:22-25.  Additional training included wheelchair operation and CPR.  Sarychev Decl. ¶ 12; Bents Decl. ¶ 17.

Travelon owns approximately eighty-five vans, which includes the equipment necessary for STS work.  Viktor Cernatinskij Dep. at 154:22-155:4;  Alpha & Omega Dep. at 58:18-23; Ex. L § 3, ECF No. 48-12.  Travelon also owns forty-four electronic tablets, a subscription to the MediRoutes application (App), and automotive insurance for the business.  Viktor Cernatinskij Dep. at 90:14-24, 159:7-12, 161:7-11.  Travelon and Viktor Cernatinskij paid about $50,000 per vehicle; $350 per tablet; $1,500 for MediRoutes and $250 for Internet bills, monthly; and $14,000 of insurance per van, yearly.  Id. at 90:14-21; 156:7-16; 161:7-11; 163:13-23; 184:17.

Travelon required new drivers to sign "independent contractor agreements" (Agreements).  The Agreements required drivers "to provide [STS] with pickup and delivery deadlines for [Travelon's] customers" as "required and upon request from Travelon."  Ex. K § 1, ECF No. 48-11.  The Agreements contained an automatic renewal clause for additional 180-day terms in perpetuity.  Id. § 19, ECF No. 48-11.  Drivers did not have the ability to negotiate the Agreements' terms, and non-English-speaking drivers were not

5

provided translated versions of the Agreements.  Bents Decl. ¶ 11;
Krueger Decl. ¶ 11; Derevyanko Dep. at 12:8-20.  The Agreements
claim that drivers control the manner of their performance, that
they may accept or decline assignments, may furnish their own
equipment, and may hire assistants, but as detailed below, the
Agreements did not accurately depict the relationship between
Travelon and its drivers.  See Minenko Decl. Ex. 3, § 8.

The Agreements state that drivers will receive all of the fee
paid by the client, but Travelon separately charged drivers fees
to recoup their costs.  See id. §§ 3-5; Defs.' First Requests for
Admis. No. 53; Exs. K-M, ECF Nos. 48-11, 48-12, 48-13.  Travelon
charged the drivers weekly fees, and even in weeks drivers did not
work.  Defs.' First Requests for Admis. No. 53, Exs. K-M, ECF Nos.
48-11, 48-12, 48-13.  Specifically, Travelon charged drivers $100
weekly dispatch fees and also charged drivers 30-35% of any amount
earned in excess of $300.  Ex. K § 4.a., ECF No. 48-11; Viktor
Cernatinskij Dep. at 189:20-190:21.  According to Viktor
Cernatinskij, dispatch fees paid for MediRoutes, phone and
internet bills, and the dispatchers' pay.  Viktor Cernatinskij
Dep. at 195:3-11.  Under the Agreements, Travelon was allowed to
adjust the fees with notice.  Ex. K § 4.a, ECF No. 48-11.  Travelon
also charged a weekly insurance fee of approximately $270 because
all drivers were insured through Travelon's insurance policy.
Viktor Cernatinskij Dep. at 200:10-202:7; Defs.' Interrog. No. 14.

Some of the Agreements allowed Travelon to change the amount of the insurance fee whenever it pleased.  See Ex. K § 5, ECF No. 48-11.[4]

Although the Agreements "allowed" drivers to use their own vehicles and data tablets, only two of the twenty-one drivers had their own vans, and only one driver had their own electronic tablet.  See Defs.' Interrog. No. 14; Defs.' First Requests for Admis. Nos. 13-14; see also Krueger Decl. ¶¶ 16-17; Bents Decl. ¶ 10.  As a result, most of the drivers had to use Travelon's vehicles, which bear the Travelon logo.  Krueger Decl. ¶ 21, Sarychev Decl. ¶ 10.

Travelon entered into "vehicle lease contracts" and "equipment rental contracts" with most of the drivers (Rental Contracts).  Exs. L-M, ECF Nos. 48-12, 48-13.  Travelon charged weekly vehicle lease fees between $150 and $200 and weekly maintenance fees between $40 and $75.  Viktor Cernatinskij Dep. at 183:19-184:4.  Viktor Cernatinskij instructed drivers to take the vehicles to a specific dealership because the deducted maintenance fees only covered service at that dealership - and nowhere else.  Id. at 311:1-22; Krueger Decl. ¶ 20; Bents Decl. ¶ 16; Sarychev Decl. ¶ 11.  Travelon also charged drivers monthly data fees.  Ex. M, ECF No. 48-13.  The Rental Contracts required 60 days' notice

---

[4]    The Secretary's exhibit contains multiple independent contractor agreements between drivers and defendants.

of termination, and some of them did not allow termination in the first year.  See Exs. L-M, ECF Nos. 48-12, 48-13.

Travelon provides services to clients Monday through Friday from 5:00 a.m. to 6:00 p.m., and from 5:00 a.m. to approximately 5:00 p.m. on Saturdays.  Maria Cernatinschi Dep. at 41:9-13, 42:8-15; see Krueger Decl. ¶ 32.  One driver asked to start at 8:00 a.m., but dispatch told him that he was required to work from 7:00 a.m. to 6:00 p.m.  Krueger Decl. ¶¶ 22-23.  Drivers could not work outside the approximately thirty-mile Twin Cities area.  Viktor Cernatinskij Dep. at 109:15-22.  Travelon's clients book trips by calling Travelon's dispatchers or via its website; they did not contact drivers directly.  Maria Cernatinschi Dep. at 69:7-71:5.

Travelon dispatchers assign drivers rides through the App. Id. at 139:15-18; Oi Decl. ¶ 13; Sarychev Decl. ¶ 9.  Dispatchers track drivers' locations via GPS at all times, and dispatchers instruct drivers to notify them of their availability.  Oi Decl. ¶ 15; Maria Cernatinschi Dep. at 93:9-20.  Drivers could not choose which trips to take, could not see other available trips, and could not independently arrange trips.  Oi Decl. ¶ 14; Krueger Decl. ¶ 37; Maria Cernatinschi Dep. at 73:2-8; Bents Decl. ¶ 23, Sarychev Decl. ¶ 31.

Dispatch set pick-up/drop-off times, locations, instructions for how to wait for clients, and instructions for how to assist clients via the App.  Maria Cernatinschi Dep. at 89:15-24.  Once

dispatch assigned a trip to drivers, drivers were then permitted to make contact with the client.  Id. at 111:9-11.  For medical appointments lasting at least fifteen minutes, dispatch instructs drivers to wait for clients.  Oi Decl. ¶ 22.  Dispatch would send a second driver to pick up clients for longer appointments.  Id. If clients were not ready or did not arrive for their appointments, drivers had to seek permission from dispatch to leave.  Id. ¶ 17; Krueger Decl. ¶ 44; Bents Decl. ¶ 20; Sarychev Decl. ¶ 21.  Drivers had to request breaks from dispatch, and dispatch could instruct drivers to wait before going on break.  Oi Decl. ¶ 37; Krueger Decl. ¶ 39.  Additionally, one driver had to give advance notice of time off to dispatch.  Krueger Decl. ¶ 41.

The App technically allowed drivers to decline trips, but it was different in practice.  See id. ¶ 24.  Drivers consistently explained that they never or rarely declined trips, felt like they had to be available, or were told they had to take trips, even if they declined.  Id. ¶ 30; Bents Decl. ¶ 26; Sarychev Decl. ¶¶ 18, 26.  Dispatch sent App messages to drivers directing them to accept trips.  Oi Decl. ¶ 28.  In some instances, when no drivers were available, Viktor Cernatinskij would instruct dispatch to contact drivers to take trips, or he would contact drivers himself.  Viktor Cernatinskij Dep. at 239:4-16; Oi Decl. ¶ 27.

Travelon's insurance required proof of its transportation billed, and Travelon required that drivers log their trips.  Defs.'

Interrog. No. 17;   Viktor Cernatinskij Dep. at 208:21-209:25.

Before the App, drivers completed paper trip logs, which included

clients' names, relevant times, mileage, addresses, and clients'

signatures.  See Ex. P, ECF No. 49.  Drivers sent logs to Travelon,

and Viktor Cernatinskij would follow up with drivers if logs were

not provided.   Viktor Cernatinskij Dep. at 147:8-17.   Later,

drivers recorded trip information on the App.  Maria Cernatinschi

Dep. at 128:2-7.  If they failed to do so, dispatch would contact

them.  Oi Decl. ¶ 18.

Drivers conducted mandatory vehicle inspections weekly, and

sent inspection forms to Viktor Cernatinskij.  Maria Cernatinschi

Dep. at 131:14-132:6;  Alpha & Omega Dep. at 44:2-45:20.  Viktor

Cernatinskij contacted drivers if they failed to submit inspection

forms.  Alpha & Omega Dep. at 48:22-49:8.  Drivers also had to

submit gas receipts to Travelon.  Krueger Decl. ¶ 55.

Drivers did not hire assistants or employees and did not lease

the vans to others.[5]  Id. ¶ 4; Bents Decl. ¶ 23; Sarychev Decl.

¶ 34; Derevyanko Dep. at 17:7-9.

Clients mostly paid for trips through insurance, but some

paid out-of-pocket.  Oi Decl. ¶ 42.  Travelon billed the insurance

companies - drivers had no role in that process.   Viktor

---

[5] Viktor Cernatinskij testified that one driver leased a van
to another driver, but Maria Cernatinschi later clarified that the
two shared a van.  See Viktor Cernatinskij Dep. at 290:4-15; Maria
Cernatinschi Dep. at 160:9-22.

Cernatinskij Dep. at 212:1-13.  The cost included a per trip flat rate plus mileage, which Viktor Cernatinskij asserts was set by the state and insurance providers.  Id. at 203:4-13, 207:1-16. Drivers could not change the rates.  Bents Decl. ¶ 23; Sarychev Decl. ¶ 31; Oi Decl. ¶¶ 42-43.  Travelon determined driver pay by totaling the trip amounts and deducting various fees.  Defs.' Interrog. No. 8.

According to Travelon's billing statements, roughly ninety percent of drivers worked for Travelon for more than one year, and some for more than five years.[6]  Ex. Q, ECF No. 48-16; Viktor Cernatinskij Dep. at 124:4-11.

Defendants claim that one driver worked for private customers while also working for Travelon.[7]  Defs.' Interrog. No. 18.  But Viktor Cernatinskij admitted that it is impossible to simultaneously work for Travelon and also other STS providers given the nature of the work.  Viktor Cernatinskij Dep. at 69:3-9. According to Viktor Cernatinskij, drivers would have needed to maintain separate insurance and their own MNDOT number to work

---

[6]  Maria Cernatinschi asserts that some drivers worked at Travelon for only one day or for only one week, but that assertion is undermined by Travelon's billing statements.  Maria Cernatinschi Dep. at 169:6-15.

[7]  Maria Cernatinschi testified that three drivers provided private transportation to clients, but then admitted that she was speculating.  See Maria Cernatinschi Dep. at 51:17-25; 55:15-21; 57:3-11.  Viktor Cernatinskij also guessed that another driver may have worked elsewhere.  Viktor Cernatinskij Dep. at 337:7-17.

elsewhere.  Id. at 68:3-71:3, 82:3-83:16.  He explained that if a driver had their own MNDOT number, they could not have provided transportation for Travelon because MNDOT rules forbid STS providers from simultaneously having two MNDOT numbers: here, one individual number, and one number under Travelon.  Id. at 68:5-70:7.  Consequently, Travelon drivers did not individually register themselves as STS providers and did not have their own MNDOT numbers.  Id. at 119:5-23.

## II.  Travelon's Classification Process

Viktor Cernatinskij contends that he decided to classify the drivers as independent contractors based on three data points. First, he claims that he read a twenty year-old book and its subsequent editions about independent contractors.  Id. at 217:8-223:23.  He did not say whether the book specifically referenced independent contractor classification under the FLSA.[8]  See id. Second, Viktor Cernatinskij claims to have had discussions with more than twenty lawyers over the past two decades about classification.  Id. at 225:3-228:11.  But he does not say whether he specifically discussed classification under the FLSA.  See id. Further, Viktor Cernatinskij could not identify the lawyers he spoke to or any specifics about their alleged discussions.  See

---

[8]  Viktor Cernatinskij also claims to have read other books and done internet research, but he fails to identify those sources with specificity. Viktor Cernatinskij Dep. at 222:13-223:23.

id.  Third, Viktor Cernatinskij said the drivers were classified
as independent contractors for Minnesota tax purposes, and he notes
that a Minnesota judge found two of his drivers to be independent
contractors for purposes of unemployment insurance.  Id. at 219:6;
Minenko Decl. Exs. 4-5.  Of note, some Travelon drivers previously
brought a FLSA lawsuit against defendants Travelon and Viktor
Cernatinskij, claiming employment misclassification.  See Farah v.
Alpha & Omega USA, Inc., No. 16-cv-996, 2017 WL 5712682 (D. Minn.
Nov. 27, 2017).  After the court denied defendants' motion for
summary judgment, the case settled.  See id.; Ex. HH, ECF No. 57-
4.

**III.  Computation of Back Wages**

A Wage and Hour Investigator (WHI) from the United States
Department of Labor investigated Travelon from March 20, 2017,
through March 19, 2019 (Investigation Period) for potential pay
and recordkeeping violations under the FLSA.   Latuff Decl. ¶¶ 1,
4.  The WHI determined that Travelon drivers were employees, and,
based on that determination, defendants owed overtime to all
drivers and failed to pay minimum wage for eleven drivers.  Id.
¶¶ 34-35.  The WHI discovered that defendants did not maintain a
complete set of time records, failed to produce any trip logs for
six drivers, and produced incomplete logs for others.  Id. ¶¶ 20-
21, 23, 36; see also Ex. P, ECF No. 49.  Defendants' records did
not include total daily hours worked, weekly hours worked, or any

13

pay rates.  Latuff Decl. ¶ 36; <u>see</u> <u>also</u> Exs. P, Q, ECF Nos. 49, 48-16.

The WHI calculated the following damages: back wages for the Investigation Period totaling $127,314.10; $120,378.08 in overtime compensation; and $6,936.02 in minimum wage compensation.  Exs. W-X, ECF Nos. 48-22, 48-23.

The WHI used billing sheets and trip logs to estimate drivers' compensation and hours.  Latuff Decl. ¶¶ 51, 54, 57; <u>see</u> <u>also</u> Exs. P, Q, ECF Nos. 49, 48-16.  If there were no trip logs, the WHI used averages from other weeks and drivers' declarations to reconstruct hours.  Latuff Decl. ¶¶ 65, 68.  As a result, the WHI had to determine drivers' weekly regular rates because defendants' records were inadequate.  <u>Id.</u> ¶ 70; Defs.' First Requests for Admis. Nos. 74-75.  He multiplied the weekly regular rate by one-half and applied it to hours in excess of forty.  Latuff Decl. ¶ 72.  He also calculated what drivers would have made if paid the federal minimum wage.  <u>Id.</u> ¶ 73.

Defendants do not dispute the calculation of the regular rates.  <u>See</u> Defs.' Interrog. No. 21.  Defendants also do not know the exact number of hours worked.  Defs.' First Requests for Admis. No. 68; Defs.' Interrog. No. 23.  Drivers usually worked back-to-back trips.  Krueger Decl. ¶ 38; Maria Cernatinschi Dep. at 176:14-21.  Drivers would wait for another trip when they did not have one assigned.  Krueger Decl. ¶ 51; Derevyanko Dep. at 24:8-

24.   Drivers testified about keeping accurate paper logs, as well as tablet data.   <u>See</u> Oi Decl. ¶ 18; Bents Decl. ¶ 8.   Maria Cernatinschi testified that she never talked to drivers about the accuracy of their trip logs.   Maria Cernatinschi Dep. at 199:22-25.   Nevertheless, she testified that drivers' logged departure times from clients' residences were sometimes inaccurate, but she did not dispute the accuracy of drivers' logged arrival times at clients' residences or the logged drop-off times at clients' appointments.   <u>See</u> <u>id.</u> at 201:8-20.

The Secretary commenced this action on April 28, 2020, alleging violations of the FLSA and seeking back wage damages, liquidated damages, and injunctive relief. Both sides now move for summary judgment.

### DISCUSSION

### I.   Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A fact is material only when its resolution affects the outcome of the case.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).   A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.   <u>See</u> <u>id.</u> at 252.

15

The court views all evidence and inferences in a light most favorable to the nonmoving party.  See id. at 255.  The nonmoving party must set forth specific facts sufficient to raise a genuine issue for trial; that is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 249-50; Celotex v. Catrett, 477 U.S. 317, 324 (1986).

## II.  Claims under the FLSA

The FLSA requires employers to pay non-exempt employees the federal minimum wage and to compensate non-exempt employees "at a rate not less than one and one-half times" their regular rates for hours worked in excess of 40 hours.  See 29 U.S.C. §§ 206(a), 207(a)(1).  The FLSA mandates that an employer-employee relationship must exist in order to bring claims for overtime compensation and minimum wage violations.  See Ash v. Anderson Merchandisers, LLC, 799 F.3d 957, 961-62 (8th Cir. 2015); Childress v. Ozark Delivery of Mo. L.L.C., 95 F. Supp. 3d 1130, 1138 (W.D. Mo. 2015) (citing 29 U.S.C. § 216(b)).  The FLSA also requires employers to "make, keep, and preserve" records of employees' wages, hours, and other employment conditions. 29 U.S.C. § 211(c); see also 29 C.F.R. § 516 (listing specific recordkeeping requirements).

16

The Secretary alleges that defendants violated the FLSA's overtime compensation, minimum wage, and recordkeeping requirements, and seeks unpaid back wages, liquidated damages, and injunctive relief.  At issue is whether drivers are defendants' employees and therefore entitled to unpaid overtime compensation and minimum wages.  If the drivers are defendants' employees, the parties dispute whether defendants violated the FLSA's overtime, minimum wage, and recordkeeping requirements.  Furthermore, the parties dispute the Secretary's computation of unpaid back wages and whether the drivers are entitled to liquidated damages.

## III. Employment Classification under the FLSA

Drivers must be employees in order to receive overtime compensation and unpaid minimum wages under the FLSA.  See 29 U.S.C. § 216(b).  To determine employment classification, the court must evaluate "the economic reality of the arrangement."  Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005) (citation omitted).  This fact-intensive inquiry involves an evaluation of the following factors:

> (1) whether the service rendered by the worker is an integral part of the alleged employer's business; (2) the degree of skill required for the rendering of the services; (3) the worker's investment in equipment or materials for the task; (4) the degree of the alleged employer's right to control the manner in which the work is performed; (5) the worker's opportunity for profit or loss, depending upon his skill; and (6) the permanency of the relationship between the parties.

Wang v. Jessy Corp., No. 17-cv-5069, 2020 WL 3618596, at *4 (D. Minn. July 2, 2020), appeal dismissed sub nom. Wang v. Jessy Corp., No. 20-2621, 2020 WL 8374140 (8th Cir. Aug. 5, 2020) (citing Acosta v. Off Duty Police Servs., Inc., 915 F.3d 1050, 1055 (6th Cir. 2019)).  The economic reality test looks at the "totality of the circumstances, and not any one factor ... determines whether a worker is the employee of a particular alleged employer." Le v. Regency Corp., 957 F. Supp. 2d 1079, 1089 (D. Minn. 2013). "[P]utting on an 'independent contractor' label does not take the worker from the protection of the Act." Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947).  Under this standard, Travelon's drivers are unquestionably employees.

   **A.  Integral to the Business**

   The first factor, whether the service rendered by the worker is an integral part of the alleged employer's business, weighs heavily in favor of employee status.  Travelon's entire business in centered on providing STS transportation.  Specifically, clients pay Travelon to drive them to and from their medical appointments.  Without drivers, Travelon would be unable to provide those services to clients and would not generate revenue. Defendants contend that Travelon simply provides dispatching and vehicle leasing services to drivers and that it is the intermediary between drivers and clients.  As set forth in detail above, this contention is belied by the record.  Defendants' argument that

their drivers are somehow not integral to their business is disingenuous and, frankly, absurd. See Solis v. Kan. City Transp. Grp., No. 10-0887-CV-W-REL, 2012 WL 3753736, at *10 (W.D. Mo. Aug. 28, 2012) (finding drivers that drove elderly were integral to transportation company and rejecting defendants' argument that it was merely a dispatching and leasing enterprise).

**B.    Degree of Skill**

The second factor, the degree of skill required for the rendering of the services, also weighs in favor of employee status. Drivers do not need a high school degree or past experience providing STS.  Cf. Keller v. Miri Microsystems, LLC, 781 F.3d 799, 809 (6th Cir. 2015) (explaining that workers who learn skills through "formal education, an apprenticeship, or years of experience" are more likely independent contractors).  Drivers only need to be eighteen years of age, have a regular driver's license, and have a clean driving record and background.  See Campos v. Zopoundis, 2011 WL 2971298, at *7 (D. Conn. 2011) (citation omitted) ("[P]ossession of a driver's license and the ability to drive an automobile is properly characterized as a 'routine life skill.'").  Drivers did not need a special skill in order to perform their work.

Moreover, if employers supply the training or there is little training involved, workers are likely employees.  See Keller, 781 F.3d at 809.  Drivers received only a few hours of training on the

19

job from a long-time Travelon driver, who received some instruction from Viktor Cernatinskij. Drivers would either pay Viktor Cernatinskij or the Travelon driver for the training. Although the drivers were taught CPR and basic standard aid for its passengers, the court is not convinced that it is a "special skill" if it can be learned in a matter of hours.

**C.   Investment in Equipment and Materials**

The third factor, the worker's investment in equipment or materials for the task, also weighs in favor of employee status. Defendants argue that the court may only look at the drivers' investments and must ignore defendants' investments. But courts routinely compare workers' and businesses' relative investments in assessing this factor. See Karlson v. Action Process Serv. & Priv. Investigations, LLC, 860 F.3d 1089, 1093 (8th Cir. 2017) (comparing "the relative investments of the alleged employer and employee" while applying the economic realities test); see also Kan. City Transp. Grp., 2012 WL 3753736, at *9 (comparing investments between drivers and transportation company). In Kansas City Transportation Group, drivers for a transportation company either purchased a personal vehicle or leased a vehicle, paid for fuel and dispatch services, and leased meter equipment. Id. Despite these investments, the court found that this factor weighed in favor of employee status because "their individual investments were disproportionately small when compared to [d]efendant's

20

investments," which included owning a fleet of vehicles, paying personnel, and overhead costs. Id.

Similarly, an overwhelming majority of Travelon's drivers had to lease appropriate vehicles from Travelon, and pay – through wage deductions - for dispatch services, car maintenance, and gas. Nevertheless, Travelon and Viktor Cernatinskij – by their own admission – invested hundreds of thousands of dollars in approximately eighty-five vans, forty-four electronic tablets, the App subscription, and vehicle insurance. Defendants' investments dwarfed the drivers' investments. Defendants' attempt to disguise the magnitude of their investments by recouping their expenses through leasing arrangements with drivers does not change this reality.

### D. Degree of Control

The fourth factor, the degree of the alleged employer's right to control the manner in which the work is performed, weighs in favor of employee status. Relevant here is whether defendants exercised "meaningful" control over "economic aspects of the business." Hopkins v. Cornerstone Am., 545 F.3d 338, 343 (5th Cir. 2008) (citation omitted). Here, defendants exercised control over nearly every meaningful aspect of the drivers' work. Travelon's dispatch assigned trips to drivers, limited the geographic scope of their trips, and pressured them to take the trips, even if they wanted to decline. Drivers were unable to see

21

available trips and could only accept trips offered by Travelon dispatch.   Travelon commanded drivers to work at specific times, kept regular hours over drivers, and required permission to take breaks.   Travelon's dispatch services directed drivers where to go, when to go, and how to support clients.   Additionally, Travelon constantly supervised drivers by: tracking drivers' GPS locations, requiring them to submit travel logs for each trip, and dictating when they were allowed to leave when a client was running late. In other words, defendants controlled nearly every significant aspect of the drivers' work.

Defendants argue that some of these control measures, such as recordkeeping requirements and pay rates, were imposed by Minnesota law or third parties, and, therefore, are not evidence of control.   Even putting aside those particular facts, Travelon controlled every other aspect of the job:  who the driver picked up, where the trip began and ended, and when the trip began and ended.   Travelon also supervised the drivers' every movement and set their schedule.   These facts are sufficient to find that defendants exercised meaningful control over the drivers.   See, e.g., Kan. City Transp. Grp., 2012 WL 3753736, at *8 (finding that transportation company exercised control by telling drivers who to pick up, when to perform the trip, where to perform the trip, and imposing a flat-rate); Acosta v. Senvoy, LLC, No. 3:16-CV-2293-PK, 2018 WL 3722210, at *5-6 (D. Or. July 31, 2018) (finding that

defendant exercised control over delivery drivers when they controlled drivers' schedules, tracked their location with GPS, and required them to log each trip).

### E. Opportunity for Profit or Loss

The fifth factor, the worker's opportunity for profit or loss, depending on skill, weighs in favor of employee status. Defendants point to the Agreements, which state that drivers were not prohibited from working for competitors, providing services for other clients, hiring helpers, or getting their vehicles serviced at their place of choice. "[T]he fact that each [p]laintiff signed an independent contractor agreement is not dispositive," rather, the court looks to the economic reality of the parties' arrangement. Farah v. Alpha & Omega USA, Inc., No. 16-cv-996, 2016 WL 11670182, at *2 (D. Minn. June 24, 2016) (citing McComb, 331 U.S. at 729). As a matter of economic reality, drivers did not work for other competitors or clients and, in fact, due to MNDOT restrictions, could not do so.[9] Drivers' rates per trip were non-negotiable, and there is no evidence that drivers were able to negotiate the terms of their Agreements. Even though the Agreements allowed drivers to hire helpers, there is no evidence that any did so. And Viktor Cernatinskij specifically instructed

---

[9] Viktor Cernatinskij and Maria Cernatinschi's guesswork that a few drivers may have worked for other companies is insufficient to refute the evidence to the contrary.

drivers to go to a specific car dealership for maintenance, and the mandatory maintenance fees deducted from drivers' pay only covered expenses at that dealership.

Defendants argue that drivers were paid by the job and, therefore, are independent contractors. Despite defendants' assertion that the work was simply job-based, drivers actually worked regularly scheduled hours, could not deviate from those hours without Travelon's permission, and were paid at a fixed rate per trip. Essentially, defendants' argument is that drivers should have secured more trips working for Travelon. Courts have repeatedly rejected this argument. See, e.g., Dole v. Snell, 875 F.2d 802, 809 (10th Cir. 1989) (citation omitted) ("[T]oiling for money on a piecework basis is more like wages than an opportunity for 'profit.'"); Kan. City Transp. Grp., 2012 WL 3753736, at *9 (rejecting the argument that drivers' controlled opportunities for profit "by working hard or by doing work for other transportation companies").

Again, the reasoning in Kansas City Transportation Group is instructive here. 2012 WL 3753736, at *8-9. In that case, defendants argued that drivers for the elderly had the opportunity for more profit by taking more routes and working longer hours. Id. at *9. The court concluded that these facts were insignificant for two reasons. First, the number of hours drivers worked "had no bearing on how much money the driver could have made on the

individual routes." Id. at *9.  Second, "[t]he decision to work longer or shorter hours" did not change the opportunity to make profit within an individual route. Id. Ultimately, the court likened "driving additional routes" to "a waiter making more money by taking another shift." Id. As the record shows: Travelon assigned jobs to drivers via the App; drivers could not see other available rides or choose from them; drivers could not negotiate their rates per project; drivers were pressured into accepting trips and worked specific hours; and Travelon instructed drivers as to how many clients to pick up and where to drop them off.

### F.  Permanency of the Relationship

The sixth factor weighs in favor of employee status. Independent contractors "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration." Keller, 781 F.3d at 807 (citation omitted). Defendants argue that this factor favors independent contractor status based on Maria Cernatinschi's testimony, in which she claims that some drivers had one-week-long relationships with Travelon. Defendants also argue that, because the Agreements had definite initial terms of 180 days and allowed drivers to work for competitors, drivers' relationships with Travelon are not permanent in nature.

25

As an initial matter, Maria Cernatinschi's vague testimony about the length of certain drivers' tenure with Travelon is usurped by the record. According to Travelon's own billing statements, nineteen of the twenty-one drivers drove for Travelon for more than one year. Moreover, some drivers worked for Travelon for more than five years, and one driver worked for Travelon for more than a decade.

Even if the court were to accept Maria Cernatinschi's assertions, other facts favor finding a permanent relationship between Travelon and the drivers. Defendants fail to mention that the Agreements included automatic renewal clauses. Automatic renewal clauses suggest an indefinite duration of the relationship and therefore are in favor of employee status. See, e.g., Solis v. Velocity Exp., Inc., No. CV 09-864-MO, 2010 WL 3259917, at *9 (D. Or. Aug. 12, 2010) (finding that routine renewal of contracts favors employee status); Senvoy, LLC, 2018 WL 3722210, at *9 (citation omitted) ("[A]utomatic contract renewals are evidence that a worker is an employee."). Additionally, the court looks "to whether the individual works simultaneously for two employers, as would be the case with an independent contractor." Catani v. Chiodi, No. 00-cv-1559, 2001 WL 920025, at *5 (D. Minn. Aug. 13, 2001). The record makes clear that drivers worked exclusively for Travelon and did not simultaneously hold other employment.

In sum, all six factors favor employee status.  The court therefore finds that the drivers were employees of Travelon as a matter of law.

## IV.  Minimum Wage, Overtime, and Recordkeeping Violations

The FLSA requires employers to pay non-exempt employees the federal minimum wage.  See 29 U.S.C. § 206(a).  Based on the calculations provided in the Secretary's Exhibit X, ECF No. 48-23,[10] which includes the hours worked per week and the gross pay for each week, the court concludes that the eleven identified drivers were paid below the minimum wage on the identified occasions.

The FLSA requires that non-exempt employees are compensated "at a rate not less than one and one-half times" their regular rates for hours worked in excess of 40 hours.  29 U.S.C. § 207(a)(1).  If an employee is not paid hourly, their regular rate is determined on a workweek basis by dividing total weekly remuneration by the total number of weekly hours worked.  29 C.F.R. § 778.109.  "Plaintiffs [are] required to present evidence that they worked above their scheduled hours without compensation and that the [employer] knew or should have known that they were working overtime."  Hertz v. Woodbury Cty., Iowa, 566 F.3d 775, 781 (8th Cir. 2009) (citation omitted).  "[C]onstructive knowledge

---

[10] Defendants argue that the Secretary's calculation is incorrect but cite to the wrong exhibit in doing so.

27

of overtime work is sufficient to establish liability under the FLSA, if [defendants], through reasonable diligence, should have acquired knowledge that [p]laintiffs were working in excess of their scheduled hours." Id. Defendants argue that they did not have actual or constructive knowledge that drivers worked over forty hours, and therefore cannot be held liable for overtime violations.

The court rejects defendants' argument because defendants should have known that drivers worked in excess of forty hours per week. Travelon and Viktor Cernatinskij required drivers to submit weekly trip logs that tracked the drivers' start and end times. See Farah v. Alpha & Omega USA, Inc., No. 16-cv-996, 2017 WL 5712682, at *3 (D. Minn. Nov. 27, 2017). Despite defendants' claim that they did not know when drivers were working, the record shows that: (1) dispatchers organized back-to-back trips for drivers; (2) drivers had to request permission to take breaks during the day; and (3) dispatchers tracked drivers' locations via GPS. See id. Moreover, Travelon orchestrated drivers' daily work schedules, instructed drivers on their movements, and consistently directed drivers over nearly twelve hour days. See Schmidt v. DIRECTV, LLC, No. 14-cv-3000, 2017 WL 3575849, at *5 (D. Minn. Aug. 17, 2017) (finding that defendant "ke[eping] records of [p]laintiffs' work schedule and track[ing] [p]laintiffs' job status" suggested that it should have known about plaintiffs'

overtime).  Defendants should have known - and almost surely did know - that drivers worked overtime and, therefore, violated the FLSA's overtime compensation requirements.

The FLSA requires employers to "make, keep, and preserve" records of employees' wages, hours, and other employment conditions.  29 U.S.C. § 211(c).  Employers must keep pay records for three years and time records for two years.  29 C.F.R. §§ 516.5-516.6.  Travelon failed to keep time records for two years, and other records did not contain the required pay and time information.  Defendants therefore violated the recordkeeping requirements under the FLSA.

## V.   Computation of Back Wages

Normally, "[a]n employee [under the FLSA] who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.'"  Holoway v. Statasys, Inc., 771 F.3d 1057, 1059 (8th Cir. 2014) (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946)).  "If an employer has failed to keep records, employees are not denied recovery under the FLSA simply because they cannot prove the precise extent of their uncompensated work."  Id. (citation omitted).  If an employee offers "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference," then it is the employer's burden "to produce evidence to dispute the

reasonableness of the inference." Id. (quoting Carmody v. Kan. City Bd. of Police Comm'rs, 713 F.3d 401, 406 (8th Cir. 2013)).

The Secretary has proffered sufficient evidence to allow the court to make reasonable inferences regarding the amount of work completed by the drivers. Defendants attack the accuracy of the trip logs but offer no evidence to support alternative hours worked by drivers.[11] Defendants cannot benefit from their own inadequate recordkeeping. Defendants do not dispute that the trip logs accurately indicate when drivers arrived at clients' homes and when drivers dropped off clients at appointments. Given that detail, there is sufficient information contained within the travel logs to estimate drivers' hours.

Defendants also dispute whether drivers worked between trips and whether time between trips should be counted towards the amount worked. Waiting time constitutes time worked if an employee is "engaged to wait." 29 C.F.R. § 785.14. The record reflects that drivers took back-to-back trips, worked regularly kept hours, and had to notify Travelon of breaks. Defendants do not provide evidence to the contrary but rather cite to the absence of records. Again, defendants do not get to benefit from their legally

---

[11] Defendants also argue that paragraph 16 of the WHI's declaration is hearsay and should not be considered. The WHI does not offer for the truth of the matter asserted, but rather, for the purposes of describing his methodology. Moreover, the calculation is substantiated by reliable sources, such as deposition testimony and declarations in the record.

deficient recordkeeping.   Due to the drivers' demonstrated readiness to work, the Secretary properly considered time between trips as "engaged to wait" time.   Defendants fail to raise a genuine issue of fact regarding the Secretary's computation of back wages.

## VI.  Liquidated Damages

An employer who violates the FLSA's minimum wage and overtime compensation requirements is liable for liquidated damages equal to the amount of back wages.  29 U.S.C. § 216(c).  "[L]iquidated damages [are] mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA."  Jarrett v. ERC Properties, Inc., 211 F.3d 1078, 1083 (8th Cir. 2000) (internal quotations omitted) (quoting Braswell v. City of El Dorado, 187 F.3d 954, 957 (8th Cir. 1999)). "[T]he burden is a difficult one, with double damages being the norm and single damages the exception."  Chao v. Barbeque Ventures, LLC, 547 F.3d 938, 941–42 (8th Cir. 2008) (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999)).

Defendants have not met their burden.  Viktor Cernatinskij's purported self-research and "decades of legal consultation" are unsupported and indefinite, and, even if true, fail to show specific analysis under the FLSA.  Defendants' contention that they researched classification status under the FLSA in response to the Farah litigation is unpersuasive to establish good faith

31

under the FLSA.  Defendants do not provide any evidence of FLSA classification analysis done before the Farah litigation or after the Farah litigation to ensure compliance.  Merely responding to litigation does not meet defendants' high burden.

Defendants' reliance on Minnesota unemployment law decisions is misplaced.  Reliance on state unemployment law decisions for FLSA classifications are insufficient.  See, e.g., Crouch v. Guardian Angel Nursing, Inc., 2009 WL 3737887, at *24 (M.D. Tenn. Nov. 4, 2009) (rejecting reliance on a Tennessee unemployment law decision because "the FLSA is likely broader" than Tennessee law). Even if defendants had relied on a Minnesota Department of Labor decision, it would not have been sufficient.  In McKinney v. Med Group Transportation LLC, a transportation company argued that its classification of drivers was reasonable when it relied on a Wisconsin State Department of Workforce Labor's determination that its drivers were independent contractors under state law.  988 F. Supp. 2d 993, 1004 (E.D. Wis. 2013).  The company emphasized that Wisconsin's employment classification law is interpreted consistent with the FLSA.  Id.  The court rejected this argument, explaining that the state's determination cited no legal authority, other than the Wisconsin statute, and did not contain "rigorous legal analysis."  Id.  The court ultimately held that defendants were liable for liquidated damages.  Id.  For the same reasons stated in McKinney, the court finds defendants' reliance

on Minnesota unemployment law cases does not establish good faith
or reasonableness.

In sum, the court finds that defendants are liable for
liquidated damages.

## VII. Joint and Several Liability

The court finds that Viktor Cernatinskij is jointly and
severally liable with Alpha & Omega.  The FLSA recognizes that
employers can jointly employ workers.  See Falk v. Brennan, 414
U.S. 190, 195 (1973).  The Eighth Circuit Court of Appeals
recognizes individual liability under the FLSA.  Darby v. Bratch,
287 F.3d 673, 681 (8th Cir. 2002); Chambers Constr. Co. v.
Mitchell, 233 F.2d 717, 724 (8th Cir. 1956) (finding an owner as
joint employer when engaged in "active management of the affairs
of the corporation").  Viktor Cernatinskij is the sole owner and
the chief executive officer of Alpha & Omega.  He made all relevant
employment decisions, including the classification of the drivers.
Consequently, Viktor Cernatinskij is individually liable, and
jointly and severally liable with Alpha & Omega.

## VIII.    Injunctive Relief

The court finds that the requested injunctive relief is
appropriate here.  District courts may enjoin pay and recordkeeping
violations under the FLSA.  29 U.S.C. § 217.  "Where the Secretary
has established violations of the Act, the district court should
ordinarily grant injunctive relief ... unless the district court

is soundly convinced that there is no reasonable probability of a recurrence of the violations." Marshall v. Van Matre, 634 F.2d 1115, 1118 (8th Cir. 1980).

Based on the facts of this case, and given previous litigation, the court is not convinced that defendants will comply with the FLSA's requirements in the future. Previous investigations into defendants' employment practices and the lack of diligence to properly classify employees raises a reasonable probability of a future occurrence.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED THAT:**

1.   Defendants' motion for summary judgment [ECF No. 27] is denied;

2.   The Secretary's motion for summary judgment [ECF No. 46] is granted;

3.   Defendant Viktor Cernatinskij is an "employer" under section 3(d) of the FLSA, 29 U.S.C. § 203(d)(3);

4.   Defendants' drivers, identified in Exhibit A of the Secretary's complaint, are employees under section 3(e)(1), 29 U.S.C § 203(e)(1), of the FLSA;

5.   Defendants violated the FLSA's minimum wage provisions, 29 U.S.C. § 206, by failing to pay drivers the federal minimum wage of $7.25 per hour for all hours worked;

6.   Defendants violated the FLSA's overtime provisions, 29 U.S.C. § 207, by failing to compensate drivers at least one and one-half times their regular rates for hours in excess of forty hours per week;

7.   Defendants violated the FLSA's recordkeeping provisions, 29 U.S.C. § 211(c), by failing to: (1) maintain a complete set of time records; and (2) keep and maintain time and pay records reflecting each driver's total hours worked each week, including regular and overtime hours; each driver's regular rates; and each driver's weekly premium pay;

8.   The Secretary properly computed back wages for the 21 drivers listed in Exhibit A of the Secretary's complaint for the time period from March 20, 2017, through March 19, 2019;

9.   Defendants are jointly and severally liable for the full amount of back wages and for an equal amount in liquidated damages;

10.   Defendants shall pay $127,314.10 in back wages due to the 21 drivers listed in Exhibit A of the Secretary's complaint under section 16 of the FLSA, with an equal amount of liquidated damages, for a total amount of $254,628.20. The amounts due to each driver shall be paid in accordance with the Secretary's WH-56 Form;

11.   Defendants are enjoined and restrained, under section 17 of the FLSA, 29 U.S.C. § 217, from withholding the back wages and

liquidated damages found due and from prospectively violating the FLSA's minimum wage, overtime, and recordkeeping provisions; and

   12.   Defendants shall properly classify all current and future drivers as employees and pay them in accordance with the FLSA, 29 U.S.C. § 201 et seq.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 9, 2021

s/David S. Doty
David S. Doty, Judge
United States District Court
